# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2017AP2217 |

| | |
|---|---|
| COMPLETE TITLE: | In the matter of the condition of D. K.: |
| | Marathon County, |
| |       Petitioner-Respondent, |
| |   v. |
| | D. K., |
| |       Respondent-Appellant-Petitioner. |

REVIEW OF DECISION OF THE COURT OF APPEALS
Reported at 384 Wis. 2d 272,921 N.W.2d 14
(2018 – unpublished)

| | |
|---|---|
| OPINION FILED: | February 4, 2020 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | November 25, 2019 |

| | |
|---|---|
| SOURCE OF APPEAL: | |
| COURT: | Circuit |
| COUNTY: | Marathon |
| JUDGE: | Karen L. Seifert |

JUSTICES:

ZIEGLER, J., delivered the majority opinion of the Court with respect to Parts I., II., III., IV.A., IV.B., and IV.C.1, in which ROGGENSACK, C.J., REBECCA GRASSL BRADLEY, KELLY, and HAGEDORN, JJ., joined, the majority opinion of the Court with respect to Part V., in which ROGGENSACK, C.J., KELLY and HAGEDORN, JJ., joined, and an opinion with respect to Parts IV.C.2., and IV.D., in which ROGGENSACK, C.J., and HAGEDORN, JJ., joined. REBECCA GRASSL BRADLEY, J., filed a concurring opinion, in which KELLY, J., joined. DALLET, J., filed a dissenting opinion, in which ANN WALSH BRADLEY, J., joined.

NOT PARTICIPATING:

ATTORNEYS:

For the respondent-appellant-petitioner, there were briefs filed by *Catherine R. Malchow*, assistant state public defender. There was an oral argument by *Catherine R. Malchow*.

For the petitioner-respondent, there was a brief filed by *Michael J. Puerner* and *Scott M. Corbett*, corporation counsel. There was an oral argument by *Michael J. Puerner*.

NOTICE

**This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.**

No. 2017AP2217
(L.C. No. 2017ME132)

STATE OF WISCONSIN      :      IN SUPREME COURT

**In the matter of the condition of D. K.:**

**MARATHON COUNTY,**

        **Petitioner-Respondent,**

    **v.**

**D. K.,**

        **Respondent-Appellant-Petitioner.**

**FILED**

**FEB 4, 2020**

Sheila T. Reiff
Clerk of Supreme Court

---

ZIEGLER, J., delivered the majority opinion of the Court with respect to Parts I., II., III., IV.A., IV.B., and IV.C.1, in which ROGGENSACK, C.J., REBECCA GRASSL BRADLEY, KELLY, and HAGEDORN, JJ., joined, the majority opinion of the Court with respect to Part V., in which ROGGENSACK, C.J., KELLY and HAGEDORN, JJ., joined, and an opinion with respect to Parts IV.C.2., and IV.D., in which ROGGENSACK, C.J., and HAGEDORN, JJ., joined. REBECCA GRASSL BRADLEY, J., filed a concurring opinion, in which KELLY, J., joined. DALLET, J., filed a dissenting opinion, in which ANN WALSH BRADLEY, J., joined.

---

REVIEW of a decision of the Court of Appeals. *Affirmed.*

¶1 ANNETTE KINGSLAND ZIEGLER, J. This is a review of an unpublished decision of the court of appeals, Marathon County v. D.K., No. 2017AP2217, unpublished slip op. (Wis. Ct. App.

Aug. 7, 2018), affirming the Winnebago County circuit court's[1] Wis. Stat. ch. 51 orders for involuntary commitment and involuntary medication and treatment.[2] D.K. argues that he should not have been committed because the County failed to prove by clear and convincing evidence that he was dangerous as defined under Wis. Stat. § 51.20(1)(a)2.b. (2015-16).[3] The County disagrees, and also argues that D.K.'s commitment is a moot issue.

¶2 At the final hearing, the County had to prove by clear and convincing evidence that D.K. was mentally ill, a proper subject for commitment, and dangerous. Wis. Stat. § 51.20(1)(a). The circuit court concluded that Winnebago County met its burden of proof, ordered D.K.'s involuntary commitment for six months, and ordered involuntary medication and treatment. The court of appeals affirmed. It concluded that D.K.'s threats and plans to strangle police officers and kill other people established a "'reasonable fear . . . of serious physical harm' under § 51.20(1)(a)2.b," and, therefore, "the circuit court's dangerousness determination . . . was

---

[1] The Honorable Karen L. Seifert presided.

[2] Winnebago County was the original petitioner in this case. But after the circuit court entered its order, venue was transferred to Marathon County. On appeal, Marathon County was designated as the petitioner-respondent and argued before the court of appeals and this court. Throughout this opinion, we will refer to Marathon County as "the County."

[3] All subsequent references to the Wisconsin Statutes are to the 2015-16 version unless otherwise indicated.

2

supported by the evidence." D.K., No. 2017AP2217, unpublished slip op., ¶11. On review, we are asked to decide two issues: (1) whether D.K.'s challenge to his commitment order is moot; and (2) whether there was clear and convincing evidence that D.K. was dangerous under § 51.20(1)(a)2.b.

¶3 We conclude that D.K.'s commitment is not a moot issue because it still subjects him to a firearms ban. We also conclude that there was clear and convincing evidence at the final hearing that D.K. was dangerous as defined under Wis. Stat. 51.20(1)(a)2.b. Thus, we affirm the court of appeals.

## I. FACTUAL BACKGROUND

¶4 On April 25, 2017, Officer Kelly Schmitz of the Winnebago County Sheriff's Department arrested D.K. The next day, Officer Schmitz filed a Statement of Emergency Detention by Law Enforcement Officer in the Winnebago County circuit court. According to the Statement, D.K. had complained that the Oshkosh Police Department bugged his phone and that other people were "stalking him" and lying about him. The Statement also alleged that D.K. had emailed the Department's human resources director and requested a meeting with the police chief so he could "strangle him to death." It also alleged that D.K. had threatened to "hurt every single person" who was stalking him and lying about him.

¶5 On April 28, 2017, the circuit court commissioner determined that there was probable cause to believe that D.K. was mentally ill, a proper subject for treatment, and dangerous

3

to himself or others. See Wis. Stat. § 51.20(7)(a). The circuit court commissioner ordered that D.K. be detained at Winnebago Mental Health Institute pending a final hearing. That same day, the circuit court issued an Order Appointing Examiners, appointing Dr. Jagdish Dave and Dr. Yogesh Pareek. See Wis. Stat. § 51.20(9)(a). Both doctors examined D.K. and filed reports with the circuit court. See Wis. Stat. § 51.20(9)(a)5.

¶6 On May 11, 2017, the circuit court held a final hearing. See Wis. Stat. §§ 51.20(10), (13). Winnebago County presented only one witness——Dr. Dave. Winnebago County did not move Dr. Dave's report into evidence at the hearing, although the report had been filed with the circuit court.[4] Winnebago County did not call Dr. Pareek or any fact witness such as Officer Kelly or the human resources director to testify.[5] D.K. did not testify. Thus, the only evidence at the final hearing was Dr. Dave's testimony.

¶7 Dr. Dave is a psychiatrist. He stated that he had the opportunity to evaluate D.K. Dr. Dave spoke with D.K., observed

---

[4] We will not refer to the contents of Dr. Dave's report because the circuit court did not rely on it when it made factual findings and legal conclusions. Nor did the parties rely on its contents in their arguments before this court. Thus, we need not decide whether filing Dr. Dave's report with the circuit court was sufficient to enter the report into evidence.

[5] The County attempted to call a different officer, but D.K. objected because the officer was not on the witness list. See Wis. Stat. § 51.20(10)(a). The circuit court sustained the objection and did not permit the officer to testify.

4

him, and reviewed his records. Dr. Dave stated his conclusion to a reasonable degree of medical certainty that D.K. suffered from a mental illness called delusional disorder and had "substantial disorder of thought and perception." He also concluded that D.K.'s judgment and behavior were substantially impaired, he was a proper subject for treatment, and he needed treatment. Corporation counsel for Winnebago County then asked Dr. Dave, "Based on your interview of [D.K.] were you able to form an opinion as to whether or not he had presented a substantial risk of danger to either himself or others?" Dr. Dave responded, "To other people."

¶8 Dr. Dave then explained the basis of his opinion. He stated that D.K. was "paranoid about people around him. He had thoughts of harming those people who were talking about him, making fun of him. He also was making some threats against [the] police department because he had thought that they were not listening to him . . . ." Corporation counsel then asked, "Did he tell you what his intentions were with regard to the police or any of the persons in the public?" Dr. Dave responded, "Yes." "He plans on strangulating the police officer and also killing the people who made fun of him." Dr. Dave also testified that D.K.'s threats were directly related to his delusional disorder.

¶9 On cross-examination, Dr. Dave made multiple other statements relevant to D.K.'s argument before this court. Dr. Dave stated that D.K.: "was acting on his delusional belief and he could be potentially dangerous"; "can act on those thoughts

5

and he can become potentially dangerous"; "could be still potentially dangerous"; "was expressing those thoughts and he probably may have acted on those thoughts"; and "most possibly . . . might act on those thoughts." Dr. Dave also stated, "I don't think I can make [a] difference whether he will act on his thoughts or not."

¶10 It is this final hearing evidence that we review, along with the circuit court's findings and conclusions, for clear and convincing evidence of dangerousness.

## II. PROCEDURAL POSTURE

¶11 The circuit court made an oral ruling at the final hearing. The circuit court concluded:

> Based on the testimony that at this point is the only testimony and it's uncontroverted, I do find that Dr. Dave testified that [D.K.] suffers from a major mental illness.
>
> . . .
>
> He testified that [D.K.] is mentally ill, that [D.K.] is a proper subject for treatment. He testified that he is a danger to others, specifically that he is paranoid, that he has thoughts of harming people and has made threats to the police department that he wanted—-he had thoughts that he wanted to strangle police and kill people. These are homicidal thoughts and that's what the doctor testified to.
>
> On that basis I do find that it's appropriate that [D.K.] be committed for a period of [6] months, that he be under the care and custody of the department and that it be inpatient treatment at this time.

When counsel for D.K. asked the circuit court to clarify under which statutory subsection it found dangerousness, corporation

6

counsel suggested that the circuit court's findings fell under Wis. Stat. § 51.20(1)(a)2.b., "which would be indicating that he evidences a substantial probability of physical harm to others as manifested by evidence of recent homicidal or other violent behavior." The circuit court responded, "That's what I heard the doctor testify to."

¶12 The circuit court issued its Order of Commitment that same day. It stated that the grounds for commitment were that D.K. was mentally ill, dangerous, a proper subject for treatment, and a resident of Winnebago County. It also stated that, as a result of his commitment, D.K. was prohibited from possessing a firearm. The circuit court also issued its Order for Involuntary Medication and Treatment. D.K. then filed a Notice of Intent to Pursue Postcommitment Relief.[6]

¶13 On May 17, 2017, D.K. was transferred from inpatient to outpatient status. On June 12, 2017, the circuit court issued an Order for Transfer of Venue to Marathon County because D.K. had changed his residence to Marathon County. On November 6, 2017, D.K. filed a Notice of Appeal. On November 11, 2017, D.K.'s six-month commitment expired and the County did not seek an extension.

¶14 On August 7, 2018, the court of appeals issued its decision affirming the circuit court. First, it declined to

---

[6] The various record documents refer interchangeably to a Notice of Intent to Pursue "Postconviction" Relief or "Post Disposition" Relief. Since this was a commitment proceeding, we refer to this document as a Notice of Intent to Pursue Postcommitment Relief.

7

address whether the issue was moot because the County did not argue mootness in its briefing. D.K., No. 2017AP2217, unpublished slip op., ¶3 n.3 (citing State v. Verhagen, 2013 WI App 16, ¶38, 346 Wis. 2d 196, 827 N.W.2d 891 (unrefuted arguments are deemed conceded)). Second, the court of appeals concluded:

> [W]hile in Dr. Dave's presence, [D.K.] specifically threatened strangulation and murder of multiple people for specific, delusional perceptions of his ill treatment by those people. We conclude those 'plans' and threats establish a 'reasonable fear . . . of serious physical harm' under [Wis. Stat.] § 51.20(1)(a)2.b. In sum, the circuit court's dangerousness determination was based upon a correct interpretation of § 51.20(1)(a)2.b. and was supported by the evidence.

D.K., No. 2017AP2217, unpublished slip op., ¶3 n.3.

¶15 On September 5, 2018, D.K. petitioned this court for review. We granted the petition.

### III. STANDARD OF REVIEW

¶16 We must first determine whether D.K.'s challenge to his six-month commitment is moot because it has expired. Mootness is a question of law that we review independently. Waukesha Cty. v. S.L.L., 2019 WI 66, ¶10, 387 Wis. 2d 333, 929 N.W.2d 140.

¶17 We must also interpret Wis. Stat. § 51.20(1)(a)2.b. in order to determine whether the County proved dangerousness in D.K.'s case. The interpretation of a statute presents a question of law that this court "reviews de novo while benefiting from the analyses of the court of appeals and circuit

8

court." State v. Alger, 2015 WI 3, ¶21, 360 Wis. 2d 193, 858 N.W.2d 346 (citing State v. Ziegler, 2012 WI 73, ¶37, 342 Wis. 2d 256, 816 N.W.2d 238).

¶18 Finally, we must review whether there was clear and convincing evidence of dangerousness as defined under Wis. Stat. § 51.20(1)(a)2.b. at D.K.'s final hearing. D.K. does not challenge any of the circuit court's factual findings as clearly erroneous. "'We will not disturb a circuit court's factual findings unless they are clearly erroneous.'" Winnebago Cty. v. Christopher S., 2016 WI 1, ¶50, 366 Wis. 2d 1, 878 N.W.2d 109, cert. denied, 136 S.Ct. 2464 (2016) (quoting Outagamie Cty. v. Melanie L., 2013 WI 67, ¶38, 349 Wis. 2d 148, 833 N.W.2d 607). Accordingly, our review of statutory dangerousness requires us to apply the facts to the statutory standard and presents a question of law that we review independently. Christopher S., 366 Wis. 2d 1, ¶50.

## IV. ANALYSIS

### A. The Commitment is Not a Moot Issue.

¶19 Mootness is a doctrine of judicial restraint. "'An issue is moot when its resolution will have no practical effect on the underlying controversy.'" Portage Cty. v. J.W.K., 2019 WI 54, ¶11, 386 Wis. 2d 672, 927 N.W.2d 509 (quoting PRN Assocs. LLC v. DOA, 2009 WI 53, ¶25, 317 Wis. 2d 656, 766 N.W.2d 559). Because moot issues do not affect a live controversy, this court generally declines to reach them. Id., ¶12. But we may overlook mootness if the issue falls within one of five

9

exceptions: (1) the issue is of great public importance; (2) the issue involves the constitutionality of a statute; (3) the issue arises often and a decision from this court is essential; (4) the issue is likely to recur and must be resolved to avoid uncertainty; or (5) the issue is likely of repetition and evades review. Id.

¶20 The County argues that D.K.'s challenge to his commitment is moot because his commitment has expired and the issue does not fall in any of the exceptions. D.K. argues that the County forfeited its mootness argument. D.K. also argues that the issue is not moot because, even though the commitment expired, three collateral consequences of his commitment remain. First, D.K., having been committed under Wis. Stat. § 51.20, is liable for the costs of his care to the extent that he can pay. Wis. Stat. §§ 46.10(2)-(3). Second, D.K.'s involuntary commitment order prohibits him from possessing a firearm, which would otherwise be his right. U.S. Const. amend. II; Wis. Const. art. I, § 25. Third, D.K. cites the negative stigmas often attached to mental commitment as a lasting consequence.

¶21 The court of appeals addressed mootness in a footnote of its opinion. It concluded, "The [C]ounty does not address this argument in its response brief, so we do not opine on mootness here but rather reach the merits of this appeal. See State v. Verhagen, 2013 WI App 16, ¶38, 346 Wis. 2d 196, 827 N.W.2d 891 (unrefuted arguments are deemed conceded)." D.K., No. 2017AP2217, unpublished slip op., ¶3 n.3. But the County

10

did argue mootness before this court. Accordingly, we do address the issue.

¶22 We have previously concluded that an expired initial commitment order is moot. Christopher S., 366 Wis. 2d 1, ¶30. However, the issue of collateral consequences' effect on an otherwise moot commitment was not raised in that case. Then in J.W.K., we specifically left open the question whether collateral consequences render an expired commitment not moot. We said, "Our holding that J.W.K.'s [challenge to his commitment] is moot is limited to situations where, as here, no collateral implications of the commitment order are raised." J.W.K., 386 Wis. 2d 672, ¶28 n.11. We said these collateral consequences may include a firearms ban, civil claims, and costs of care. Id. And now, in this case, D.K. has raised the issue of collateral consequences.

¶23 The idea that collateral consequences can render an otherwise moot issue not moot is nothing new in Wisconsin. Over 40 years ago, in State v. Theoharopoulos, this court concluded that collateral consequences could render a prior criminal conviction not moot. 72 Wis. 2d 327, 240 N.W.2d 635 (1976). In that case, a criminal defendant challenged a prior conviction for which he had already served his sentence in full. Id. at 329. We noted that the defendant's challenge faced a mootness hurdle. Id. at 332. But the defendant argued that the issue of his prior conviction was not moot. Id. Specifically, the defendant argued that his prior conviction was not moot because he was "being held on a detainer and may be subjected to the

11

further penalty of deportation because of the [prior conviction]." Id. at 333. We concluded the prior conviction was not moot because "on the face of the record, there [was] a causal relationship between the defendant's present confinement and the prior conviction which he wishes to attack." Id.; see also State v. Larkin, Nos. 2007AP1646 through 2007AP1650, unpublished slip op., ¶6 (Wis. Ct. App. Jul. 24, 2008) (concluding the defendant's "challenge to his completed sentences [was] not moot because he [was] still experiencing the collateral consequences of his convictions in the form of an enhanced federal sentence"); State v. Genz, No. 2016AP2475-CR, unpublished slip op., ¶10 (Wis. Ct. App. Jan. 30, 2018) (stating that a "'criminal case is moot only if it is shown that there is no possibility that any collateral legal consequences will be imposed on the basis of the challenged conviction.' . . . A challenge to a conviction is not moot because the relief sought would free a defendant from all consequences flowing from his or her conviction") (citing Sibron v. New York, 392 U.S. 40, 57 (1968); Lane v. Williams, 455 U.S. 624, 630 (1982)).

¶24 Of course, this is not a criminal case. But the logic of Theoharopoulos is just as sound here. In this case, there is a "causal relationship between" D.K.'s firearms ban and the civil commitment "which he wishes to attack." Theoharopoulos, 72 Wis. 2d at 333. The circuit court's commitment order says:

> The subject is prohibited from possessing any firearm. Federal law provides penalties for, and you may be prohibited from possessing, transporting, shipping, receiving, or purchasing a firearm, including, but not

12

limited to, a rifle, shotgun, pistol, revolver, or ammunition, pursuant to 18 U.S.C. 921(a)(3) and (4) and 922(g)(4). This prohibition shall remain in effect until lifted by the court. Expiration of the mental commitment proceeding does not terminate this restriction.

(Emphasis added.)

¶25 As a result of his civil commitment, D.K. is "prohibited from possessing any firearm." And the "[e]xpiration of the mental commitment proceeding [did] not terminate this restriction." Accordingly, though his commitment has expired, D.K. is still subject to the lasting collateral consequence of a firearms ban. Since D.K. would otherwise have a fundamental right to bear arms, this is no minor consequence. See U.S. Const. amend II; Wis. Const. art. I, § 25; see also District of Columbia v. Heller, 554 U.S. 570 (2008); Wisconsin Carry, Inc. v. City of Madison, 2017 WI 19, 373 Wis. 2d 543, 892 N.W.2d 233. On appeal, a decision in D.K.'s favor would void the firearms ban and therefore have a "practical effect." Thus, we conclude that D.K.'s commitment is not a moot issue because it still subjects him to the collateral consequence of a firearms ban.[7] We now proceed to the merits.

B. Constitutional Rights And Commitment Proceedings

¶26 The Fifth Amendment declares that no person shall be "deprived of life, liberty, or property, without due process of

---

[7] Because we conclude that the firearms ban is itself sufficient to render D.K.'s commitment not moot, we need not address whether the collateral consequences of costs of care under Wis. Stat. § 46.10(2)-(3) or negative stigma would render the same result.

13

law. . . . " U.S. Const. amend. V. "'[C]ommitment for any purpose constitutes a significant deprivation of liberty that requires due process protection.'" J.W.K., 386 Wis. 2d 672, ¶16 (quoting Jones v. United States, 463 U.S. 354, 361 (1983)). Accordingly, civil commitment cases are to be handled with the utmost diligence and care. Two due process protections are implicated in D.K.'s case——the what, and the how of commitment cases.

¶27 First, due process dictates what the petitioner must prove for commitment to be appropriate. The petitioner must prove that the individual is both mentally ill and dangerous. O'Connor v. Donaldson, 422 U.S. 563, 576 (1975) ("In short, a State cannot constitutionally confine without more a nondangerous individual who is capable of surviving safely in freedom by himself or with the help of willing and responsible family members or friends.") It is not sufficient to show that the individual is mentally ill. Id. at 575. Nor is it sufficient to show "[m]ere public intolerance or animosity." Id.

¶28 Second, due process dictates how the petitioner must prove commitment is appropriate. The petitioner must prove that commitment is appropriate by clear and convincing evidence. Addington v. Texas, 441 U.S. 428, 432-33 (1979). The Supreme Court concluded that clear and convincing evidence is the appropriate burden of proof in commitment cases because the individual liberty at stake is of great "weight and gravity." Id. at 427. But, notably, the Supreme Court declined to adopt

14

the "beyond a reasonable doubt" standard in commitment cases because that standard lends itself to "specific, knowable facts." Id. at 430. Civil commitment cases do not. "The subtleties and nuances of psychiatric diagnosis render certainties virtually beyond reach in most situations." Id. The clear and convincing evidentiary standard balances the individual's significant liberty interest with the State's interests in "providing care to its citizens who are unable . . . to care for themselves" and "protect[ing] the community from the dangerous tendencies of some who are mentally ill." Id. at 425.

¶29 Accordingly, in a civil commitment case, due process requires the petitioner to prove by clear and convincing evidence that the individual is both mentally ill and dangerous. The Wisconsin Statutes codify the same and additional protections.

C. Statutory Interpretation

1. Wisconsin Stat. § 51.20 Commitment Proceedings Generally

¶30 We pause a moment to discuss the general statutory framework for involuntary commitment proceedings in Wisconsin. Then we will interpret and apply the particular section at issue in D.K.'s case. Involuntary commitment proceedings are controlled by Wis. Stat. § 51.20. Just last term, we described these proceedings:

> To initiate commitment proceedings involving a mentally ill individual under Wis. Stat. § 51.20, the County must file a petition alleging the individual is (1) mentally ill and a proper subject for treatment,

15

and (2) "[t]he individual is dangerous." § 51.20(1)(a)1-2; see also [Waukesha Cty. v. J.W.J., 2017 WI 57, ¶18, 375 Wis. 2d 542, 895 N.W.2d 783]. The statute contains five standards by which the County may show the individual is dangerous. § 51.20(1)(a)2.a.-e. Each requires the County to identify recent acts or omissions demonstrating that the individual is a danger to himself or to others. See id. During the final hearing, the County bears the burden of proving the allegations in the petition by clear and convincing evidence. § 51.20(13)(e); J.W.J., 375 Wis. 2d 542, ¶19, 895 N.W.2d 783. If the grounds in the petition are proven, then the court "shall" order commitment. § 51.20(13)(a)3; see also M.J. v. Milwaukee Cty. Combined Cmty. Servs. Bd., 122 Wis. 2d 525, 529-30, 362 N.W.2d 190 (Ct. App. 1984). The initial period of commitment cannot exceed six months. § 51.20(13)(g)1.

J.W.K., 386 Wis. 2d 672, ¶17.

¶31 In this case, the circuit court concluded that D.K. was mentally ill, a proper subject for commitment, and dangerous as defined under Wis. Stat. § 51.20(1)(a)2.b. D.K. disputes the circuit court's conclusion as to dangerousness only. This court has never before interpreted § 51.20(1)(a)2.b. We do so now.

2. Wisconsin Stat. § 51.20(1)(a)2.b. Dangerousness

¶32 Pursuant to Wis. Stat. § 51.20(1)(a)2.b., an individual is dangerous if he or she:

Evidences a substantial probability of physical harm to other individuals as manifested by evidence of recent homicidal or other violent behavior, or by evidence that others are placed in reasonable fear of violent behavior and serious physical harm to them, as evidenced by a recent overt act, attempt or threat to do serious physical harm.

§ 51.20(1)(a)2.b.

¶33 In this case, the County argues there was clear and convincing evidence that D.K. presented "a substantial

16

probability of physical harm to other individuals as manifested by . . . evidence that others [were] placed in reasonable fear of violent behavior and serious physical harm to them, as evidenced by a . . . threat to do serious physical harm." Wis. Stat. § 51.20(1)(a)2.b. Accordingly, we interpret that language, and that language only.

¶34 Statutory interpretation "begins with the language of the statute." State ex rel. Kalal v. Circuit Court for Dane Cty., 2004 WI 58, ¶45, 271 Wis. 2d 633, 681 N.W.2d 110 (internal quotations omitted). If its meaning is plain, then our inquiry ends. Id. We give statutory language "its common, ordinary, and accepted meaning." Id. We give "technical or specially-defined words or phrases" their "technical or special definitional meaning." Id. "Context is important to meaning." Id., ¶46. Accordingly, we interpret statutory language "not in isolation but as part of a whole." Id. For the whole statute to have meaning, we must "give reasonable effect to every word" and "avoid surplusage." Id.

¶35 While this court has never before interpreted the entirety of Wis. Stat. § 51.20(1)(a)2.b., Wisconsin courts have interpreted portions of the language included in this section. We begin with "substantial probability." In State v. Curiel, we interpreted the phrase "substantial probability" in Wis. Stat. § 980.02(2)(c) (1995-96) and "substantially probable" in Wis. Stat. § 980.01(7) (1995-96). 227 Wis. 2d 389, 402-03, 597 N.W.2d 697 (1999). We noted that both the legislature and courts use the two phrases interchangeably and concluded that

17

they "share a common meaning." Id. at 403. We then interpreted the plain language and concluded that the two phrases mean "much more likely than not." Id. at 406. Importantly, we connected this conclusion to the "substantial probability" language in ch. 51. We explained:

> Both ch. 980 and ch. 51 employ a "substantial probability" standard. We held that the term "substantially probable" as used in ch. 980 means "much more likely than not." As the terms are to be used in a consistent manner between the chapters, we can conceive of no reason why the term as used in ch. 51 should be construed any differently than it is under ch. 980.

Id. at 414.[8] We also noted that the legislature had amended Wis. Stat. § 51.20 in 1977. Id. at 410. It replaced "substantial risk" with "substantial probability." Id. In this case, the County did not dispute that "substantial probability" means "much more likely than not." We now reaffirm that "substantial probability" in Wis. Stat. § 51.20(1)(a)2.b. means "much more likely than not."

¶36 Under the plain language of the statute, evidence of a "substantial probability of physical harm to other individuals" must be "manifested by" "evidence of recent homicidal or other violent behavior" or "evidence that others are placed in reasonable fear of violent behavior and serious physical harm to them, as evidenced by a recent overt act, attempt or threat to

---

[8] Since our decision in State v. Curiel, 227 Wis. 2d 389, 597 N.W.2d 697 (1999), the legislature has changed the language of both Wis. Stat. §§ 980.01(7) and 980.02(2)(c). Both sections now use the word "likely." See §§ 980.01(7) and 980.02(2)(c) (2015-16)..

do serious physical harm." Wis. Stat. § 51.20(1)(a)2.b. Because the County argues that it presented clear and convincing evidence of "reasonable fear," we focus our interpretation on that portion of the statute.

¶37 In R.J. v. Winnebago County, the court of appeals interpreted "evidence that others are placed in reasonable fear of violent behavior and serious physical harm to them" in Wis. Stat. § 51.20(1)(a)2.b.——the same section at issue here. 146 Wis. 2d 516, 431 N.W.2d 708 (Ct. App. 1988). In that case, R.J. argued that "them" meant only the individuals threatened. Id. at 521. Under R.J.'s interpretation, there was no "reasonable fear" unless the threatened individual was subjectively aware of the threat. Id. The court of appeals correctly concluded that that interpretation was too narrow. Id. at 522. R.J.'s interpretation would have rendered insufficient evidence that a person was placed in reasonable fear of serious physical harm to another person. The court of appeals rejected that narrow interpretation of the statute. Id. Instead, it concluded that the statute was satisfied by "a showing . . . that others are placed in a fearsome position by a [mentally ill] person's actions even if the person placed in that position has no subjective awareness of it." Id. at 523. Neither party to this case challenges the court of appeals' interpretation in R.J. Rather, consistent with R.J., both parties agreed that Dr. Dave's testimony, as a third-party witness to D.K.'s alleged threat to harm others, could be sufficient to satisfy the

19

statute. They dispute only whether Dr. Dave's testimony actually was sufficient.

¶38 We conclude that the court of appeals' interpretation in R.J. is consistent with the plain language of Wis. Stat. § 51.20(1)(a)2.b. Specifically, we conclude that a plain reading of the statute demonstrates that "them" in the second clause of that section refers back to "other individuals" in the first clause. See § 51.20(1)(a)2.b. ("Evidences a substantial probability of physical harm to other individuals as manifested . . . by evidence that others are placed in reasonable fear of violent behavior and serious physical harm to them . . . ") (emphasis added). Thus, under the plain language of the statute, evidence that a person was placed in reasonable fear of serious physical harm to that person or another person can be sufficient to establish a "reasonable fear" under § 51.20(1)(a)2.b.

¶39 In his briefing and at oral argument, D.K. argued that the County could not prove dangerousness under Wis. Stat. § 51.20(1)(a)2.b. without showing facts supporting an objective, "reasonable fear." Specifically, D.K. argued that the County did not prove that he was dangerous because there was no testimony to facts concerning his demeanor at the time he made his threats.

¶40 We agree with D.K. that Wis. Stat. § 51.20(1)(a)2.b. establishes an objective test. But our agreement ends there, and we decline to adopt D.K.'s interpretation. His interpretation would read out the first portion of

20

§ 51.20(1)(a)2.b. Under D.K.'s interpretation, evidence of "reasonable fear" would be both necessary and sufficient to establish "a substantial probability of physical harm." See § 51.20(1)(a)2.b. Put simply, a "reasonable fear" would equal a "substantial probability." That cannot be right for two reasons. First, the plain language of those two phrases suggests otherwise——different words require different meanings.[9] See State ex rel. DNR v. Wisconsin Court of Appeals, District IV, 2018 WI 25, ¶28, 380 Wis. 2d 354, 909 N.W.2d 114 ("When the legislature uses different terms in the same act, we generally do not afford them the same meaning.") Indeed, at oral argument, the County agreed that "the substantial probability is informed by the requirement of . . . threats that would put a reasonable person at fear of serious physical harm"; that those phrases must be given separate meaning in order to "harmonize" the statutory language. Second, if "reasonable fear" and "substantial probability" in § 51.20(1)(a)2.b. meant the same thing, then one or the other would be surplusage. We must interpret statutory language "to give reasonable effect to every word" and "avoid surplusage." Kalal, 271 Wis. 2d 633, ¶46; see also Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts, 174-79 (2012) ("Surplusage Canon"); id. at 174 ("If possible, every word and every

---

[9] Common sense suggests that "reasonable" is something less than "substantial." Thus, D.K.'s interpretation would likely provide less protection for the mentally ill than the one we adopt today.

21

provision is to be given effect. . . . None should needlessly be given an interpretation that causes it to duplicate another provision or to have no consequence.").

¶41 We conclude that a finding of a "reasonable fear" supports a separate finding of a "substantial probability." In other words, evidence of a "reasonable fear" is necessary but not automatically sufficient alone to conclude there is a "substantial probability of physical harm" under Wis. Stat. § 51.20(1)(a)2.b. A "reasonable fear" may, and perhaps often will, establish a "substantial probability." But it will not necessarily always end the analysis.

¶42 In sum, we conclude that the plain language of Wis. Stat. § 51.20(1)(a)2.b. requires a showing that it is much more likely than not that the individual will cause physical harm to other individuals. Id. This conclusion can be supported by evidence that at least one person was placed in "reasonable fear of violent behavior and serious physical harm" to that same person or another.[10] Id. This reasonable fear must be "evidenced by" a "recent overt act," an "attempt," or a "threat to do serious physical harm." Id.

¶43 We now proceed to decide the merits of D.K.'s case: whether there was clear and convincing evidence at the final hearing that D.K. was dangerous under Wis. Stat. § 51.20(1)(a)2.b.

---

[10] It can also be supported by "evidence of recent homicidal or other violent behavior" but that language is not at issue in this case. See Wis. Stat. § 51.20(1)(a)2.b.

D.  There Was Clear And Convincing Evidence of Dangerousness.

¶44  At the outset, we note that D.K. does not challenge any of the circuit court's factual findings as clearly erroneous.  Nor does D.K. challenge the circuit court's conclusions that D.K. had a mental illness and was a proper subject for commitment.  Thus, we review the evidence presented at the final hearing and the circuit court's findings to decide whether there was clear and convincing evidence that D.K. was dangerous as defined under Wis. Stat. § 51.20(1)(a)2.b.

¶45  At the final hearing, corporation counsel asked Dr. Dave, "Based on your interview of [D.K.] were you able to form an opinion as to whether or not he had presented a substantial risk of danger to either himself or others?"  Dr. Dave responded, "To other people."  The clear meaning of Dr. Dave's testimony is that D.K. "presented a substantial risk of danger" "[t]o other people."

¶46  Dr. Dave then explained his conclusion.  He stated that D.K. was "paranoid about people around him.  He had thoughts of harming those people who were talking about him, making fun of him.  He also was making some threats against [the] police department because he had thought that they were not listening to him . . . ."  Corporation counsel then asked, "Did he tell you what his intentions were with regard to the police or any of the persons in the public?"  Dr. Dave responded, "Yes."  "He plans on strangulating the police officer and also killing the people who made fun of him."  Dr. Dave also

23

testified that D.K.'s threats were directly related to his delusional disorder.

¶47 The circuit court concluded:

> [Dr. Dave] testified that [D.K.] is mentally ill, that [D.K.] is a proper subject for treatment. He testified that he is a danger to others, specifically that he is paranoid, that <u>he has thoughts of harming people and has made threats to the police department that he wanted--he had thoughts that he wanted to strangle police and kill people.</u> These are homicidal thoughts and that's what the doctor testified to.

(Emphasis added.) The circuit court then confirmed that its conclusions fell under Wis. Stat. § 51.20(a)(1)2.b. D.K. does not challenge any of the circuit court's factual findings as clearly erroneous.

¶48 When we review this record, it is uncontroverted that Dr. Dave witnessed D.K.'s threats to harm others and testified that he "plan[ned] on strangulating the police officer and also killing the people who made fun of him." Dr. Dave testified that D.K. presented a substantial risk of danger "[t]o other people." Additionally, the circuit court found that D.K. made threats to the police department and wanted to strangle police and kill people.

¶49 We conclude that Dr. Dave's testimony and the circuit court's factual findings established that D.K. was dangerous under Wis. Stat. § 51.20(1)(a)2.b. There was clear and convincing evidence that D.K. "[e]vidence[d] a substantial probability of physical harm to other individuals as manifested by . . . evidence that others [were] placed in reasonable fear

24

of violent behavior and serious physical harm to them, as evidenced by a . . . threat to do serious physical harm." § 51.20(1)(a)2.b.

¶50 D.K. argues that this evidence is negated by statements Dr. Dave made during cross-examination. See Pucci v. Rausch, 51 Wis. 2d 513, 519, 187 N.W.2d 138 (1971) (stating that "an expert opinion expressed in terms of possibility or conjecture is insufficient"). Specifically, D.K. argues that certain statements Dr. Dave made failed to establish a "substantial probability." Dr. Dave stated that D.K.: "could be potentially dangerous"; "can become potentially dangerous"; "could be still potentially dangerous"; "probably may have acted"; and "most possibly . . . might act." Dr. Dave also stated, "I don't think I can make [a] difference whether he will act on his thoughts or not."

¶51 We agree with D.K. that this equivocal testimony alone would be at least arguably insufficient to establish a "substantial probability." We will not attempt to discern what the phrases "probably may have acted" or "most possibly . . . might act" mean. We need not so attempt because we do not review Dr. Dave's statements in isolation. Rather, we review his testimony and the circuit court's findings as a whole. As we concluded above, Dr. Dave's testimony on direct-examination established clear and convincing evidence that D.K. was dangerous under Wis. Stat. § 51.20(1)(a)2.b. And his testimony as a whole supports that conclusion. Dr. Dave testified that D.K. presented a substantial risk of danger "to

25

other people." He never negated or withdrew his conclusion that D.K. was dangerous.

¶52 While mere possibility and conjecture are insufficient, we will not disregard Dr. Dave's testimony simply because he expressed something less than certainty. The statute does not require certainty, but rather a "substantial probability." Wis. Stat. § 51.20(a)(1)2.b. Furthermore, we have never required a mental illness expert to be clairvoyant and we decline to do so now. See Addington, 441 U.S. at 430 ("The subtleties and nuances of psychiatric diagnosis render certainties virtually beyond reach in most situations."); see also D.K., No. 2017AP2217, unpublished slip op., ¶9 ("To the extent that [D.K.] criticizes [Dr.] Dave's testimony as 'speculat[ive],' Wis. Stat. § 51.20(1)(a)2.b. did not require [Dr.] Dave, in providing an expert opinion, to be clairvoyant of [D.K.'s] future acts in order to establish a 'substantial probability' of harm due to [D.K.'s] recent threats and his medical diagnosis.")

¶53 D.K. also argues that Dr. Dave's testimony was insufficient under Outagamie County v. Melanie L., 2013 WI 67, 349 Wis. 2d 148, 833 N.W.2d 607. In that case, we reversed an involuntary medication order under Wis. Stat. § 51.61(1)(g)4.b. Id., ¶¶96-97. Under that section, the county "must prove that the person is substantially incapable of applying an understanding of the advantages and disadvantages of particular medication . . . ." Id., ¶94. We reversed because the expert in that case misstated the substance of the statutory standard.

26

The expert testified that Melanie was not "'capable of applying the benefits of the medication to her advantage' rather than that she was substantially incapable of applying an understanding of the advantages, [and] disadvantages" of the medication. Id., ¶6. We concluded that the county did not meet its burden of proof because the expert's testimony "did not sufficiently address and meet the statutory standard." Id., ¶97. We explained:

> Medical experts must apply the standards set out in the competency statute. An expert's use of different language to explain his or her conclusions should be linked back to the standards in the statute.

Id.

¶54 D.K. uses Melanie L. to argue that Dr. Dave was required to testify to the exact statutory standard and that his statements on cross-examination were therefore insufficient. But the issue in Melanie L. was that the expert's testimony misstated the substance of the statutory standard. That is not true here. Dr. Dave did not misstate the substance of the standard; he merely failed to recite it exactly. Melanie L. does not stand for the proposition that we require witnesses or circuit courts to recite magic words. Rather, it stands for the proposition that a medical expert's testimony and conclusions "should be linked back to the standards in the statute." Melanie L., 349 Wis. 2d 148, ¶97. Dr. Dave testified that D.K.: was paranoid and suffered from delusions; presented a "substantial risk of danger" "to other people"; and "plan[ned] on strangulating the police officer and also killing" other

27

people. (Emphasis added.) This is not the exact statutory language, but it does "link back" to it. See Wis. Stat. § 51.20(1)(a)2.b. (requiring a "substantial probability of physical harm to other individuals as manifested by . . . evidence that others [were] placed in reasonable fear of violent behavior and serious physical harm to them, as evidenced by a . . . threat to do serious physical harm") (emphasis added).

¶55 We pause once more to speak to the bench and the bar. We do so because finality in a commitment proceeding is very important to all concerned. D.K.'s commitment expired in November 2017, and he will not have a final answer to the question whether his commitment was appropriate until 2020. Had certain things happened in the circuit court below, perhaps D.K.'s appeal would have been unnecessary. The record was sufficient in this case, but it could have been more detailed. The County could have further developed its medical expert's testimony, moved the expert's report into evidence, and properly provided notice of its witnesses. Also, the circuit court could have made more detailed and thorough factual findings and clarified its legal conclusions. A commitment is no trivial matter. Taking more time at the circuit court can save years of uncertainty on appeal.

## V. CONCLUSION

¶56 We conclude that D.K.'s commitment is not a moot issue because it still subjects him to a firearms ban. We also

28

conclude that there was clear and convincing evidence at the final hearing that D.K. was dangerous as defined under Wis. Stat. 51.20(1)(a)2.b.  Thus, we affirm the court of appeals.

*By the Court.*—The decision of the court of appeals is affirmed.

¶57 REBECCA GRASSL BRADLEY, J. *(concurring)*. I agree with the majority that when a commitment order infringes the individual right to bear arms with a restriction that remains in effect even after expiration of the commitment, a challenge to an involuntary commitment is not moot merely because the order has expired. I also agree with the majority's conclusion that there was clear and convincing evidence at the commitment hearing of D.K.'s dangerousness under Wis. Stat. § 51.20(1)(a)2.b (2015-16). Majority op., ¶3.[1] However, I write separately because I disagree with the majority's methodology of statutory analysis. Instead of relying exclusively on precedent, the majority should have analyzed and applied the plain meaning of the statutory text. Accordingly, I respectfully concur and I join parts I, II, III, IV.A, IV.B, and IV.C.1 of the majority opinion.

I

¶58 Resolving D.K.'s challenge requires interpretation of Wis. Stat. § 51.20(1)(a)2.b. Whenever we construe a statute, we "begin[] with the language of the statute." State ex rel. Kalal v. Circuit Court of Dane Cty., 2004 WI 58, ¶45, 271 Wis. 2d 633, 681 N.W.2d 110 (quoted source omitted). If the meaning of the statute is plain and unambiguous, we stop the inquiry. See id. (citations omitted). While the majority recites these seminal principles of statutory interpretation, see majority op., ¶34, it only superficially applies them, opting to discuss past

---

[1] All subsequent references to the Wisconsin Statutes are to the 2015-16 version unless otherwise indicated.

precedent rather than conducting a thorough textual analysis. See majority op., ¶¶35-37. I begin with the text of § 51.20.

¶59 In order for a county to involuntarily commit an individual under Wis. Stat. § 51.20, a court must find that the individual is: (1) mentally ill; (2) a proper subject for treatment; and (3) dangerous. § 51.20(1)(a)1-2; see also Waukesha Cty. v. J.W.J., 2017 WI 57, ¶18, 375 Wis. 2d 542, 895 N.W.2d 783 (quoted source omitted). Wisconsin Stat. § 51.20(1)(a)2.a-e provides an exclusive list of five alternate means of establishing the requisite dangerousness. An individual is dangerous under the statute if he:

(a) "Evidences a substantial probability of physical harm to himself or herself as manifested by evidence of recent threats of or attempts at suicide or serious bodily harm."

(b) "Evidences a substantial probability of physical harm to other individuals as manifested by evidence of recent homicidal or other violent behavior, or by evidence that others are placed in reasonable fear of violent behavior and serious physical harm to them, as evidenced by a recent overt act, attempt or threat to do serious physical harm."

(c) "Evidences such impaired judgment, manifested by evidence of a pattern of recent acts or omissions, that there is a substantial probability of physical impairment or injury to himself or herself or other individuals."

2

(d)     "Evidences behavior manifested by recent acts or omissions that, due to mental illness, he or she is unable to satisfy basic needs for nourishment, medical care, shelter or safety without prompt and adequate treatment so that a substantial probability exists that death, serious physical injury, serious physical debilitation, or serious physical disease will imminently ensue unless the individual receives prompt and adequate treatment for this mental illness."

(e)     "[E]vidences either incapability of expressing an understanding of the advantages and disadvantages of accepting medication or treatment and the alternatives, or substantial incapability of applying an understanding of the advantages, disadvantages, and alternatives to his or her mental illness in order to make an informed choice as to whether to accept or refuse medication or treatment; and evidences a substantial probability, as demonstrated by both the individual's treatment history and his or her recent acts or omissions, that the individual needs care or treatment to prevent further disability or deterioration and a substantial probability that he or she will, if left untreated, lack services necessary for his or her health or safety and suffer severe mental, emotional, or physical harm that will result in the loss of the individual's ability to function independently in the community or the loss of

3

cognitive or volitional control over his or her thoughts or actions."

§ 51.20(1)(a)2.a-e.

¶60 Both parties agree that subdivision 2.b is the only provision at issue in D.K.'s case and both the court of appeals and the circuit court analyzed dangerousness under that subdivision. Because the text of subdivision 2.b is plain and unambiguous, my review of whether D.K. was dangerous begins and ends with the text.

¶61 Proving dangerousness under subdivision 2.b requires showing a "substantial probability of physical harm to other individuals[.]" Wis. Stat. § 51.20(1)(a)2.b. This court has already determined that "substantial probability" means "much more likely than not." State v. Curiel, 227 Wis. 2d 389, 413-14, 597 N.W.2d 697 (1999). Subdivision 2.b provides three exclusive ways to demonstrate a person is much more likely than not to physically harm other individuals:

(1) "evidence of recent homicidal" . . . behavior;

(2) evidence of recent "other violent behavior"; or

(3) "evidence that others are placed in reasonable fear of violent behavior and serious physical harm to them[.]"[2]

---

[2] In R.J. v. Winnebago Cty., the court of appeals determined the word "them" did not refer only to the individual threatened, but also included any member of the "great mass of humankind" in the class of people denoted "others" by the statute. 146 Wis. 2d 516, 521-23, 431 N.W.2d 708 (Ct. App. 1988). Because R.J. is a published court of appeals opinion, and this court has never overruled it, its holding stands as binding law in this state. See Wis. Stat. § 752.41(2). Neither party asks us to overrule it.

4

§ 51.20(1)(a)2.b.  D.K.'s case involves the third way—"others [were] placed in reasonable fear of violent behavior and serious physical harm to them[.]"  The statute lists three alternate means of evidencing a "reasonable fear of violent behavior and serious physical harm":

(1)  "[A] recent overt act";

(2)  A recent "attempt"; or

(3)  A recent "threat to do serious physical harm."

Id.

¶62  The text of subdivision 2.b plainly describes what is necessary to find a person dangerous.  The record must evidence a "recent overt act," a recent "attempt," or a recent "threat to do serious physical harm."  Any one of these three factual predicates suffices to show that others were "placed in reasonable fear of violent behavior and serious physical harm[.]"  Establishing a "reasonable fear of violent behavior and serious physical harm" is one way of demonstrating a "substantial probability of physical harm to other individuals[.]"  Establishing a "substantial probability of physical harm to other individuals" is one way of showing a person is dangerous within the meaning of Wis. Stat. § 51.20(1)(a)2.  The analysis is complete.  As evidence of "others" being "placed in reasonable fear of violent behavior and serious physical harm to them[]" a "threat to do serious physical harm[]" constitutes satisfactory evidence of dangerousness; the statutory standard is met.

5

¶63 The majority asserts that "evidence of a 'reasonable fear' is necessary but not automatically sufficient alone to conclude there is a 'substantial probability of physical harm[.]'" Majority op., ¶41. The majority misunderstands the statute. The legislature decided that, among other proof, "evidence that others are placed in reasonable fear of violent behavior and serious physical harm to them[]" constitutes one of the manifestations that a person "evidences a substantial probability of physical harm to other individuals[.]" Wis. Stat. § 51.20(1)(a)2.b. In other words, the legislature defined, with some particularity, what establishes "a substantial probability of physical harm" to others and included "others" being "placed in reasonable fear of violent behavior and serious physical harm" as evidence meeting that standard.

¶64 Puzzlingly, the majority believes this interpretation equates "reasonable fear" and "substantial probability" and, along with the dissent, invokes the surplusage canon. Neither the majority nor the dissent explain their accusations of duplication. In its analysis, the majority neglects to consider the context and structure of the statute. While the legislature embedded many layers in the determination of dangerousness, the language it used plainly says an individual is dangerous if he "[e]vidences a substantial probability of physical harm to other individuals" and a "substantial probability of physical harm" may be manifested by "evidence that others are placed in reasonable fear of violent behavior and serious physical harm to them," which in turn may be evidenced by three separate actions:

6

(1) a recent overt act; (2) an attempt to do serious physical harm; or (3) a threat to do serious physical harm. This interpretation of the statute gives effect to every word and every provision, ignoring none. In contrast, the majority offers no explanation for its conclusory assertion that "[a] 'reasonable fear' may, and perhaps often will, establish a 'substantial probability[]' [b]ut . . . not necessarily always[.]" Majority op., ¶41. As a result of this equivocation by the majority, future litigants and courts may ponder when a "reasonable fear" may or may not establish "a substantial probability of physical harm" but the legislature already told us——in the statutory language.

## II

¶65 D.K. argues that Dr. Dave's testimony at the final hearing was insufficient to meet the legal standard of dangerousness under subdivision 2.b. Because Dr. Dave repeatedly used phrases such as "could be potentially dangerous[,]" "can become potentially dangerous[,]" "could be still potentially dangerous[,]" and "I don't think I can make the difference whether he will act on his thoughts or not[,]" D.K. argues the evidence was insufficient to find him "substantial[ly] probab[le]" or "much more likely than not" to "physically harm other individuals[.]" See Wis. Stat. § 51.20(1)(a)2.b; Curiel, 227 Wis. 2d at 413-14.

¶66 Both D.K. and the dissent would impose an obligation on medical experts to use particular statutory terms in

expressing their opinions.[3]  We do not impose a "magic words" requirement in the law and this court has repeatedly rejected them.  See State v. Lepsch, 2017 WI 27, ¶36, 374 Wis. 2d 98, 892 N.W.2d 682 (rejecting in the context of a circuit court inquiring about juror bias); State v. Wantland, 2014 WI 58, ¶33, 355 Wis. 2d 135, 848 N.W.2d 810 (rejecting in context of withdrawing consent under the Fourth Amendment); Elections Bd. v. Wisconsin Mfrs. & Commerce, 227 Wis. 2d 650, 654, 669-70, 597 N.W.2d 721 (1999) (rejecting in context of what is required to be "express advocacy"); see also Patchak v. Zinke, 138 S. Ct. 897, 905 (2018) (noting that the Supreme Court refrains from reading statutes to "incant magic words" (quoted source omitted)).  The dissent asserts that "risk" is not synonymous with "probability" and because Dr. Dave testified to a substantial risk of danger, and not a substantial probability, there was not clear and convincing evidence of dangerousness under the statute.  See dissent, ¶¶79, 81, 83, 84.

¶67  The dissent is correct that risk and probability have different meanings.  See Risk, Black's Law Dictionary (11th ed. 2019) ("The uncertainty of a result, happening, or loss; the chance of injury, damage, or loss; esp., the existence and extent of the possibility of harm[.]"); Probability, Black's Law

---

[3] The dissent relies on Outagamie Cty. v. Melanie L., 2013 WI 67, 349 Wis. 2d 148, 833 N.W.2d 607, for the proposition that medical experts must testify to the specific words set forth in Wis. Stat. § 51.20(1)(a)2.b.  See dissent, ¶¶85-87.  To the extent Melanie L. can be read to impose such a "magic words" requirement, I would clarify its holding and align it with our other jurisprudence.  See supra ¶66.

8

Dictionary (11th ed. 2019) ("Something that is likely; what is likely[]"; "The degree to which something is likely to occur, often expressed mathematically; Possibility[]"; "The quality, state, or condition of being more likely to happen or to have happened than not; the character of a proposition or supposition that is more likely true than false."). Contrary to the dissent's conclusion, this distinction is not dispositive. The dissent erroneously conflates the role of the court and the role of the medical expert in commitment cases. While the medical expert testifies to the facts, the circuit court makes an independent legal judgment as to whether the facts <u>meet the legal standard</u> set forth in the commitment statute.

¶68 Contrary to the arguments of the dissent and D.K., it is immaterial that the medical expert used "substantial risk" or variants of "could be potentially dangerous[.]" It is the court's responsibility to determine whether the testimony and other evidence support a finding of a "substantial probability of physical harm" as required by the statute.[4] <u>Cf.</u> <u>Winnebago Cty. v. Christopher S.</u>, 2016 WI 1, ¶50, 366 Wis. 2d 1, 878 N.W.2d 109 (discussing how courts must apply facts to the legal statutory standard).

---

[4] Because circuit courts bear the responsibility of determining whether the evidence satisfies the statutory standard, circuit courts must expressly make independent factual findings on the record, separate from any legal conclusions. Merely reciting testimony or melding factual findings with legal conclusions can constrain appellate review. Because appellate courts overturn only factual findings that are "clearly erroneous," there must be distinct separation of factfinding from legal conclusions. <u>Cf. Winnebago Cty. v. Christopher S.</u>, 2016 WI 1, ¶50, 366 Wis. 2d 1, 878 N.W.2d 109 (discussing the standard of review in commitment cases).

9

¶69 Due to the significant deprivation of liberty associated with an involuntary commitment, due process requires that the evidence be clear and convincing. Addington v. Texas, 441 U.S. 418, 433 (1979). The evidence at the final hearing in D.K.'s case clearly and convincingly supported the circuit court's determination that D.K. was dangerous based on D.K. evidencing "a substantial probability of physical harm to other individuals[.]" Most importantly, the circuit court found that D.K. "has thoughts of harming people and has made threats to the police department that he wanted——he had thoughts that he wanted to strangle police and kill people." D.K. does not challenge this finding as clearly erroneous. As this factual finding involves a recent "threat to do serious physical harm[,]" made to Dr. Dave, it alone is sufficient to find that "others are placed in a reasonable fear of violent behavior and serious physical harm to them," which is enough to find "a substantial probability of physical harm to other individuals[.]" See Wis. Stat. § 51.20(1)(a)2.b; supra ¶¶61-62.

¶70 While this threat alone was sufficient for the circuit court to find D.K. dangerous under subdivision 2.b, it also found: (1) D.K. had homicidal thoughts; (2) D.K. has a mental illness that causes delusional disorders; and (3) D.K.'s delusions affected D.K.'s ability to recognize reality. The uncontroverted evidence introduced during the hearing also demonstrated that D.K.: (1) posed a substantial risk of danger to "other people"; (2) had plans to strangle police and kill those individuals making fun of him; (3) "could be potentially

dangerous"; (4) had feelings of persecution; and (5) was at risk of acting on his violent thoughts because they are a product of his delusions and he is unable to recognize reality.

¶71 The circuit court's factual findings that D.K. "has made threats to the police department" and "that he wanted to strangle police and kill people[]" alone render D.K. dangerous under Wis. Stat. § 51.20(1)(a)2.b. The additional factual findings, and uncontroverted hearing testimony in the record, provide additional clear and convincing evidence of D.K.'s dangerousness.

III

¶72 The majority is correct that this case is not moot. When a commitment order infringes the individual right to bear arms protected by the Second Amendment and the Wisconsin Constitution, a challenge to an involuntary commitment is not moot if the firearm prohibition survives expiration of the commitment. See U.S. Const. amend. II; Wis. Const. Art. 1, § 25.

¶73 A textual analysis of Wis. Stat. § 51.20(1)(a)2.b shows the County established D.K.'s dangerousness. The circuit court's finding that D.K. "made threats to the police department[,]" is not clearly erroneous. These "threat[s] to do serious physical harm[,]" expressed to Dr. Dave, fulfill one of the factual predicates sufficient to show "that others are placed in a reasonable fear of violent behavior and serious physical harm to them[.]" That showing, in turn, satisfies one of the tests for dangerousness under § 51.20(1)(a)2——"a

11

substantial probability of physical harm to other individuals[.]" Because the majority's analysis fails to clearly apply the plain words of the statute, I respectfully concur.

¶74 I am authorized to state that Justice DANIEL KELLY joins this concurrence.

¶75 REBECCA FRANK DALLET, J. *(dissenting).* There is no dispute that D.K. suffered from delusional disorder and that he made statements regarding plans to strangle a police officer and to kill people that he perceived to be making fun of him. The issue is whether the County presented sufficient evidence that D.K. was dangerous as a result of his disorder. In concluding that the testimony of Dr. Dave was sufficient to establish that D.K. was dangerous, the majority ignores the statutory standard set forth in Wis. Stat. § 51.20(1)(a)2.b. and implicitly overrules this court's holding in Melanie L. requiring medical experts to apply that statutory standard. Outagamie Cty. v. Melanie L., 2013 WI 67, 349 Wis. 2d 148, 833 N.W.2d 607. For this reason, I dissent.

¶76 The United States Supreme Court has acknowledged that involuntary commitment is "'a massive curtailment of liberty' and in consequence 'requires due process protection.'" Vitek v. Jones, 445 U.S. 480, 491-92 (1980) (citation omitted). Because of the significant liberty interest involved in civil commitment cases, the standard of proof of clear and convincing evidence is required to meet due process guarantees. Addington v. Texas, 441 U.S. 418, 432-33 (1979). "This Court has mandated an intermediate standard of proof——'clear and convincing evidence'——when the individual interests at stake in a state proceeding are both 'particularly important' and 'more substantial than mere loss of money.'" Santosky v. Kramer, 455 U.S. 745, 756 (1982) (quoting Addington, 441 U.S. at 424).

1

¶77 To commit an individual pursuant to Wis. Stat. § 51.20(1)(a)2.b., a county must prove by clear and convincing evidence that an individual is dangerous because he or she:

> Evidences a <u>substantial probability</u> of <u>physical harm</u> to other individuals as manifested by evidence of recent homicidal or other violent behavior, or by evidence that others are placed in reasonable fear of violent behavior and serious physical harm to them, as evidenced by a recent overt act, attempt or threat to do serious physical harm.

(Emphasis added.) Whether the facts in the record satisfy the statutory standard for commitment under § 51.20(1)(a)2.b. is a question of law which this court reviews de novo. <u>Waukesha Cty. v. J.W.J.</u>, 2017 WI 57, ¶15, 375 Wis. 2d 542, 895 N.W.2d 783.

¶78 I agree with the majority's statutory analysis of Wis. Stat. § 51.20(1)(a)2.b., <u>see</u> majority op. ¶¶30-42, because it gives effect to every statutory term, unlike the concurrence's analysis which renders the standard of "substantial probability" surplusage. However, I part ways with the majority as to whether there was clear and convincing evidence presented to the circuit court that D.K. "evidence[d] a substantial probability of physical harm."

¶79 The majority relies solely on Dr. Dave's testimony on direct examination[1] to support its conclusion that D.K. "[e]vidences a <u>substantial probability</u> of physical harm to other

---

[1] As the majority correctly notes, the County did not move Dr. Dave's report into evidence at the hearing and therefore it is not part of the record. Majority op., ¶6 & n.4.

2

individuals."[2] Dr. Dave was asked the following question on direct examination regarding the likelihood of D.K.'s current dangerousness: "Based on your interview of [D.K.], were you able to form an opinion as to whether or not [D.K.] had presented a substantial risk of danger to either himself or others?" Dr. Dave answered: "To other people."

¶80 The majority opinion pays lip service to the importance of reviewing Dr. Dave's testimony "as a whole," yet ignores his testimony on cross-examination, which it concedes was "at least arguably insufficient to establish a 'substantial probability.'" Majority op., ¶51. Dr. Dave stated on cross-examination that he was not aware of any times that D.K. had acted on his thoughts. When asked about the likelihood that D.K. would act on his thoughts, Dr. Dave opined that: D.K. "can act" on his thoughts; he "can become potentially dangerous"; he "could be still potentially dangerous"; and he "probably may have acted" on his thoughts. When asked whether Dr. Dave could tell "whether or not he was saying something [D.K.] was going to act on or maybe [was] just speaking in anger," Dr. Dave responded "I don't think I can make the difference whether he will act on his thoughts or not." These statements do not support a finding by clear and convincing evidence that D.K. was

---

[2] While the circuit court's factual findings in this case are scant, they are not clearly erroneous. See Outagamie Cty. v. Melanie L., 2013 WI 67, ¶38, 349 Wis. 2d 148, 833 N.W.2d 607 ("We will not disturb a circuit court's factual findings unless they are clearly erroneous.").

dangerous in accordance with the statutory mandate of "substantial probability."

¶81 But even if, like the majority, I only consider Dr. Dave's testimony on direct examination, the record is still insufficient to support a finding that D.K. evidences a "substantial probability of physical harm to other individuals." The majority says the "clear meaning" of Dr. Dave's direct examination testimony "is that D.K. 'presented a substantial risk of danger' '[t]o other people.'" Majority op., ¶45. But what exactly is "a substantial risk of danger"? At first blush, it looks similar to the language of Wis. Stat. § 51.20(1)(a)2.b.: "substantial probability of physical harm." However, a deeper look reveals important distinctions.

¶82 As noted by the majority opinion, the legislature amended Wis. Stat. § 51.20 in 1977 to replace "'substantial risk'" with "'substantial probability,'" signifying that there is a difference in meaning between these terms. See Richards v. Badger Mut. Ins. Co., 2008 WI 52, ¶22, 309 Wis. 2d 541, 749 N.W.2d 581 ("By analyzing the changes the legislature has made over the course of several years, we may be assisted in arriving at the meaning of a statute."). We recognized in Curiel that "there is no evidence that when the legislature amended Wis. Stat. § 51.20 in 1977 and replaced 'risk' with 'probability,' it did so with a view that 'probability' and 'risk' were synonymous." State v. Curiel, 227 Wis. 2d 389, 410, 597 N.W.2d 697 (1999); see § 29, ch. 428, Laws of 1977; Drafting File for

4

1977 Act 428, Analysis by the Legislative Reference Bureau of 1977 A.B. 898, Legislative Reference Bureau, Madison, Wis.

¶83 Moreover, the term "substantial risk" has a meaning distinct from the term "substantial probability." This court often uses dictionary definitions to ascertain the meaning of words and phrases not defined by statute. Curiel, 227 Wis. 2d at 404. The Merriam Webster Dictionary defines "risk" as a "possibility of loss or injury." "Risk," Merriam Webster Online Dictionary (2020), https://www.merriam-webster.com/dictionary/risk (emphasis added). "Possible" is defined as "being something that may or may not occur." "Possible," Merriam Webster Online Dictionary (2020), https://www.merriam-webster.com/dictionary/possible. The common usage of the words testified to by Dr. Dave is that D.K. evidences a danger to other people that may or may not occur. In contrast, this court has defined "substantial probability," as "much more likely than not." Curiel, 227 Wis. 2d at 406.

¶84 Possibility and probability are not, as the majority opinion assumes, simply interchangeable. This court has often said an expert opinion expressed in terms of possibility or conjecture is insufficient. See Pucci v. Rausch, 51 Wis. 2d 513, 519, 187 N.W.2d 138 (1971) (citing to cases dating back to 1904 for this proposition). The important distinction between possibility and probability was best described in Michalski v. Wagner, 9 Wis. 2d 22, 28, 100 N.W.2d 354 (1960), where we held that there was "no probative value" to a medical expert's

5

testimony that it was <u>possible</u> the accident caused the plaintiff's injury. We stated:

> Preponderance of mere possibilities is, of course, not the equivalent of a preponderance of probabilities. Mere possibilities leave the solution of an issue of fact in the field of conjecture and speculation to such an extent as to afford no basis for inferences to a reasonable certainty, and in the absence of at least such inferences there is no sufficient basis for a finding of fact.

<u>Id.</u> In a commitment case which carries an even higher burden of proof, an opinion testifying to clear and convincing evidence of possibilities is likewise of no probative value.

¶85 The majority concludes that a medical expert is not required to render an opinion to the standard set forth in Wis. Stat. § 51.20, and thus implicitly overrules <u>Melanie L.,</u> 349 Wis. 2d 148. In <u>Melanie L.,</u> this court determined that a medical expert's opinion that Melanie L. was unable to apply an understanding "to her advantage" did not establish clear and convincing evidence of the statutory requirement that she be "substantially incapable of applying an understanding of the advantages, disadvantages and alternatives" of medication. <u>Id.,</u> ¶96. We emphasized that "[m]edical experts <u>must</u> apply the standards set out in the competency statute" and that "[a]n expert's use of different language to explain his or her conclusions should be linked back to the standards in the statute." <u>Id.,</u> ¶97 (emphasis added). We further determined that it is a county's burden to ensure that a medical expert applies the required standard: "[w]hen [corporation counsel] did not receive an answer in those [statutory] terms, he should

6

have required his witness to expound upon his answer, so that the circuit court and a reviewing court did not have to speculate upon [the doctor's] meaning." Id., ¶91. While no medical expert is required to be clairvoyant, and certainty is not required, Melanie L. signifies that a medical expert must testify to the standard set forth in § 51.20(1)(a)2.b.

¶86 Here, as in Melanie L., Dr. Dave did not testify to the standards set forth in the competency statute and corporation counsel failed to clarify the testimony or introduce his report into evidence.[3] The majority attempts to distinguish Melanie L. by claiming that Dr. Dave "did not misstate the substance of the standard; he merely failed to recite it exactly." Majority op., ¶54. Dr. Dave did exactly what the majority opinion identified as improper: he misstated the substance of the standard. The testimony of Dr. Dave using an alternate standard did not rise to the level of proof by clear and convincing evidence that D.K. evidences a "substantial probability of physical harm to other[s]" as mandated by Wis. Stat. § 51.20(1)(a)2.b. As this court warned in Melanie L., "[Wis. Stat. ch. 51] hearings cannot be perfunctory under the

---

[3] The majority opinion recognizes that the County "could have further developed its medical expert's testimony, moved the expert's report into evidence, and properly provided notice of its witnesses." Majority op., ¶55. We review only the record before us in a case, not the record that could have been made. See Covelli v. Covelli, 2006 WI App 121, ¶14, 293 Wis. 2d 707, 718 N.W.2d 260 ("When reviewing fact finding, we search the record for evidence to support findings reached by the trial court, not for evidence to support findings the trial court did not but could have reached.").

7

law. Attention to detail is important." Melanie L., 349 Wis. 2d 148, ¶94.

¶87 Since the record before the circuit court reflects that the County's only witness did not render an opinion regarding D.K.'s likelihood of dangerousness as defined in Wis. Stat. § 51.20(1)(a)2.b., and as required by Melanie L., 349 Wis. 2d 148, I would reverse and vacate the circuit court's order.

¶88 For the foregoing reasons, I respectfully dissent.

¶89 I am authorized to state that Justice ANN WALSH BRADLEY joins this dissent.